All right, our next case is 19-2039 Quintana v. Santa Fe County. Ms. Lopez, you may proceed. Good morning, Your Honors. May it please the Court, my name is Alicia Lopez and I represent the estate of Rick Ortiz. I'd like to reserve a good three minutes for rebuttal time if possible. This appeal concerns the 14th Amendment right of pretrial detainees to adequate medical care and to freedom from punishment. The facts of the case are particularly harrowing and they were notably not taken in the light most favorable to the plaintiffs by the Court below. For that reason, I would beg the Court's indulgence while I briefly summarize what we actually alleged here. On January 4th, 2016, Rick Ortiz was booked into the Santa Fe County Jail where he informed the intake nurse that he was a heroin addict who was going to, quote, kick real hard from his withdrawal. Another inmate who was present at the time reported that he already looked ill. That nurse accessed Rick's records from his prior stints in the facility and she confirmed a long history of heroin and opiate addiction and of hepatitis C. Can I ask one foundational question before you get too far in? Should we consider the Kingsley case? It really wasn't raised below, probably subject to plain error, but if it is subject to plain error, do you want us to apply plain error review and apply, what, an objective standard here? Indeed we do. And we did brief that, so I fully concede we didn't brief it below. We briefed it for the first time here, and we believe that the Supreme Court, the well-settled standard mirrors that of the clearly established standard under qualified immunity. And we believe that, you know, we echo this Court's stated view that Kingsley eliminated any ambiguity as to what a plaintiff needs to prove to show a due process violation of a pretrial detainee's 14th Amendment rights. When you say this Court, are you talking about Colbruno? I am, indeed. Now, Colbruno wasn't until last year. It was three years after Kingsley. Yes. Is it a problem at prong three of plain error? In other words, a substantial effect on your client's rights. Well, it would only substantially affect the estate's rights if the Kingsley standard would show that there was a violation of clearly established right. There was a violation of clearly established constitutional rights. And we didn't know that until last year. Certainly, Nurse Robinson, et cetera, did not know in January of 2016 that Kingsley would be applicable in our circuit. Well, we believe that in order for the law to be well-established, there needs to be a Supreme Court case on point. It would certainly be helpful if there were also a Tenth Circuit case on point. But we believe, as did the Ninth Circuit, as did the Tenth Circuit, when it eventually applied Kingsley and Colbruno a conditions case, that Kingsley itself is what set the standard. So Kingsley was decided in 2015. The events and issue happened in 2016. We believe that is sufficient under the law to meet that plain error standard of review. That said, we also ask in the alternative that the court exercise its discretion, if it is in any way ambivalent about whether Kingsley clearly established the law, and make this the case in which the court, for the first time, applies Kingsley in the medical care context. It seems, frankly, the inevitable tide, given that it's already applied it in a conditions case. And we know from the Supreme Court in Wilson v. Sider that medical care is a condition of confinement. The court specifically held there is no significant distinction between those two categories of claim. So given that it's already been applied in the conditions context, it would be very strange indeed if it wasn't subsequently applied by this circuit in the medical care context. Now, that said- Well, there's a split in the circuits on whether Kingsley did apply a different standard for medical care, right? I'm aware, and the 11th, 8th, and 5th have all rejected it. As our amicus pointed out, the opinions that have denied the application of Kingsley outside the excessive force context  especially relative to this court's ruling in Colbruno, which makes it plain, Kingsley applied the logic of Bell, itself a conditions of confinement case, built on it, and really spoke, sounded loud bells about what the rights of pretrial detainees are. And whatever you have to prove, what you certainly don't have to prove, is a motive to punish. So having already made that step, what I'm saying is that it would be most unusual for there to be not only a split in the circuits, but an internal split on the circuit as to how far Kingsley goes. If I may return to the facts, just because the obviousness of the need, the medical need, is something that I think gets lost in what is otherwise a very lengthy opinion by the district court. I note that the nurse in the case accessed Rick's records. I think I went over this, so let me move on. But we know what she knew. We also know that she failed to perform withdrawal risk and substance abuse assessments that were critical parts of the intake process of that facility, that she failed to come up with a mandatory treatment plan for Rick, that she failed to even arrange for any follow-up monitoring of his symptoms of withdrawal. And against his specific request, she referred him into the general inmate population. Over the next two and a half days, these are the symptoms that this gentleman exhibited. Is that where her involvement stops? Yes. Okay. At intake. So she was serving in a gatekeeper capacity. Right. And so she was aware that he told her he was going to be withdrawing, and she at least made some effort. Your factual recitation said what she didn't do, but it didn't say what she did do. Well. Which she gave him, I assume a kick kit is something you give to somebody who's going to be withdrawing, right? That's not the allegation, though, although that is the district court's representation of it. So what's the allegation? The allegation is that he paid for a kick kit. The medications did not show up in his system. There have been contradictory and self-serving statements in the limited discovery that we have, because, again, this is at the 12B6 stage. We didn't even proceed to discovery, where some individuals are saying he rejected the meds, some individuals are saying maybe he didn't get the meds. So with that in mind, on information and belief, the allegation is that she didn't actually order the kit. And in the unlikely event that she did, that she didn't ensure he received the medications. And we know from the case law of one of your sister's circuits in Parsons v. Caruso, that a nurse's failure to ensure, ensure being the operative word, that a detainee received his medication was still considered liable, or at least a claim was stated against that nurse sufficient to withstand dismissal. The district court stated, Judge Browning stated, we haven't shown that she refused to provide an intake. But with all due respect, that isn't the standard. Some action isn't enough if the action you failed to take was the action that might have prevented this tragedy. Well, the district court concluded that the complaint lacked adequate allegations, adds to the subjective state of mind, let's just stay with the nurse, that she drew the inference that her conduct would lead to serious risk of harm. Is your position with respect to her, and maybe with all of them, is that his condition was so obvious that any prison official would have known that additional care was mandated, and that from that we can infer malice? It's true with respect to all of them, yes. I think with the nurse, the argument is a little bit nuanced, in that in our proposed second amended complaint, we had one of this country's foremost experts on medical care and corrections facilities stating that any licensed medical nurse would know that an individual presenting with heroin withdrawal, particularly one who asked for help in the form of broadcasting his need, I'm going to kick real hard, coupled with a comorbidity, hepatitis C, is particularly at risk, not just of having a very unpleasant experience in the facility, but at risk of death. But Dr. Venter, the one thing that Dr. Venter cannot do, and I don't think you suggest that he can or did, is to prognosticate on what Nurse Robinson's state of mind or actual knowledge was. And so why aren't the allegations about Nurse Robinson's failure to do an intake, her failure to take into consideration that he was at a prior diagnosis of hepatitis C, why aren't all those not enough if Kingsley doesn't apply and there has to be a deliberate awareness of a substantial risk of physical harm? Because when a medical need is so obvious that even a lay person would understand from it, that the need exists and that not taking reasonable measures to abate it is putting somebody at serious risk. This court has said so in Mata v. Size or in Garrett v. Stratman. When it's that obvious, you might as well infer the nurse knew it too. Sadly, there are a few people in a nurse's position like this one who broadcast their thoughts, their motive to punish, but it can be inferred by the obviousness of the need. So you asked me, Your Honor, about the nurse and whether the argument is the same with respect to the other officers. With the other officers, it is perhaps more blatant. It's easier to see because the allegation is that he starts vomiting blood the very first night. And contrary to positions taken by the county in its briefs, he did complain about it. He brought it to the attention of the first officer he encountered, Officer Dylan Chavez. But he didn't – there's nothing about that with Valda, though. I'm sorry? With Officer Valda. That argument doesn't apply to Valda, correct? All there is there is that he had a severely ill appearance, not that he knew that he was vomiting. And in looking over the complaint, what I'm struck by with respect to Valda is, again, how disadvantaged we are that we are here on a 12B6 motion. We don't have anything about what Officer Valda understood. He hasn't been deposed. We have no information about it. And given that, I was in no position to say, hey, Officer Valda knew this. What I would ask the court to understand, because it's in the complaint, it's in the chronology, is that he encountered Officer Valda the morning after he had been vomiting blood and saying so to the officer who was tasked with monitoring him, Officer Chavez. I think it can be inferred that if he was that ill, so that the following morning, the day of his encounter with Officer Valda, his cellmate is saying, he has vomited blood numerous times all over our shared cell, get me out of here. And it's noteworthy that these individuals made an intentional decision to remove that cellmate, though they also decided, evidently, to refrain from obtaining medical assistance. So they were aware of the need. But I bring this up because at that state of... Was Mr. Ortiz coherent? I mean, he could communicate with his cellmate and the guards? We know that he communicated with the first guard on the very first night. After that, it becomes a series of reports from other individuals. So we'll never know if Rick Ortiz was past the point in being able to articulate what his needs were. He never asked to see a doctor or be sent to the medical unit? We don't have any. Unfortunately, because we've been denied discovery, we don't have any information about whether he was able to articulate that. It was not in the limited but incomplete body of information that was provided to us. In fact, we asked for but did not receive complete security footage of Mr. Ortiz's cell. For instance, as I note in the complaint, security footage shows, on day two, a very wobbly Rick Ortiz struggling to drag a mattress into his cell. We know that that mattress was subsequently removed because it wasn't on his bunk when his dead body was found. I think one can reasonably conclude it was removed because it was soiled with his bloody vomit, given that he died a slow death of a gastrointestinal hemorrhage. But that footage isn't to be found. And I bring that up in point of fact just to say there's a lot that we don't know. And we don't know what Rick was capable of articulating past the first night when he was already vomiting blood. After that, it was up to others, perhaps, to speak for him. Cellmates that didn't want anywhere near him. We know from some of these statements that other inmates who were in the vicinity talked about him groaning all night in the presence of these officers. Does this discussion go somewhat to your argument about not being able to amend? Yes. I mean, it strikes me that when you basically lose on a 12B6 on qualified immunity, that to say your amendment is futile, I mean, when all you have to do is put more allegations in, seems problematic. It seemed problematic to me, too. It seemed problematic that it took 171 pages to tell us that we hadn't stated a claim. You know, again, this is 12B6. If further discovery pointed up that one of these officers for any reason didn't have individualized information, depending on what the standard is that's going to apply to these claims, then they are certainly free and clear to move for summary judgment or we'd voluntarily dismiss them. This was just premature at 12B6. You know, I find myself here being unable to articulate what the needs of my dying client were after the first night that he was in the facility. Though I suppose I took it out of the flow of my narrative, I think I hope I have made the court aware of how obvious this need was to these individuals. And even if we are applying the subjective deliberate indifference test, I think there's ample case law. We cited it, and I hope we successfully parried attempts to distinguish the case law that inmates who have displayed this sort of medical need to defendant officials have been able to successfully state a 14th Amendment claim. Returning to Kingsley, I just would like to say we've known for a generation now that the 14th Amendment protects pretrial detainees more than the 8th Amendment protects convicted prisoners. But absent a workable test from the Supreme Court, we've all been applying this 8th Amendment standard all these years, a state of affairs that is unfair on its face. Oh, I see I only have a minute left, so I'd like to reserve that and come back. Thank you. Yeah, I think it was actually overtime. No, you're good. You can do whatever you want. Good morning, Your Honors. May it please the Court. I'm Mark Comer. I'm representing the six individual defendants here along with Santa Fe County. This is a sad case. It's something that jails are seeing a lot of now, as you know, with this opioid epidemic that we have. And my clients are on the front line of that, and they see that every day. And they often encounter individuals like Mr. Ortiz who have been in the jail quite a bit with this problem, this addiction. And what's interesting about this case is we've got quite a bit of history of Mr. Ortiz in the front end of the complaint, including details about prior incarcerations in this facility. And what we know is that Mr. Ortiz had a problem with opioids and heroin specifically, but there was times he's seeking treatment for that, times he's not. He's obviously gone through withdrawal periods before, and there's no allegation in the history that the nurse apparently reviewed that morning according to the allegations of the complaint. The history that she knew that would indicate that he had ever been medically admitted for heroin. Okay, let's say that's right. I'm wondering what the legal import of that argument is. There's two prongs, as I recall, at least barring Kingsley. There has to be a sufficiently serious condition, and if one has been diagnosed with a condition requiring treatment, that would typically satisfy the objective element, correct? I agree, Your Honor, depending on the condition. And you've argued both in district court and here that Nurse Robinson affirmatively diagnosed a condition requiring treatment because she diagnosed a kit, I forget the term of it, for withdrawal, to treat withdrawal, right? That's correct, Your Honor. Actually, there's a little more to it than that. I mean, she recognized that he would be withdrawing. He told her that. She knew that from the presentation and the history, and then she actually makes a referral to the facility physician who enters an order at 2.50 that afternoon. That's in the complaint. Okay, so she does all of that. So the first element of an Eighth Amendment or due process claim is satisfied as a matter of law, right? You're not questioning the sufficiently serious condition because you've just acknowledged and affirmatively argued that Nurse Robinson diagnosed a condition requiring treatment. I agree in the sense that we've talked about two conditions, but I agree that withdrawal, if serious enough, can meet that objective constitutional threshold of the first prong you're discussing. All right. Yes. And in this particular case, the nurse not only recognized that harm. I mean, the idea here is that it's something that's either obvious to them and they're disregarding, but here the nurse recognized the potential harm from the withdrawal and makes a referral to a physician. And what our case law says is that a medical provider in that situation who makes the appropriate referral to a doctor to treat the condition has satisfied the general constitutional requirement to attend to the detainee's medical needs. All right. So assuming that the subjective knowledge requirement is satisfied and put that to the side, then the plaintiff would also have to show to satisfy a typical Eighth Amendment standard is that the officer did not take reasonable steps to avert the sufficiently serious medical condition, failed to take sufficient action, right? Are we talking about the jail officers? We're talking about what the law is. The plaintiff has to show that the officer failed to take reasonable steps to solve the problem, to avert the sufficiently serious medical condition, right? I think the test kind of depends on whether we're talking about the medical professional or not, and that's why I'm delineating. Let's talk about Nurse Robinson. So we're moving on. I'm talking about a medical professional, Nurse Robinson. Yeah. For her, I think the test has been a little bit different in the sense that we're talking about what are the circumstances under which they can be liable. I refer to a case in our brief, Spencer v. Abbott, which is an unpublished case, but it kind of identifies three areas where a medical professional could be liable under what you're discussing. Whatever the standard is, the plaintiff has affirmatively alleged in the First Amendment complaint and the proposed Second Amendment complaint that Nurse Robinson failed to actually make sure that Mr. Ortiz got this withdrawal kit. Well, there's no allegation, no factual allegation in the complaint that her role continued after this initial intake period. I mean, she makes the referral to the physician. So is there something in the First Amendment complaint or proposed Second Amendment complaint that Nurse Robinson's activities terminated when she went off duty? In other words, the plaintiff has specifically alleged that Nurse Robinson says that she ordered a withdrawal kit and failed to make sure that he got it. Well, here's what happens, I think, as a matter of what's in the complaint. Once the physician orders the kit, then there's an order to regular jail personnel to administer those medications. So it's not Nurse Robinson's problem. Yes, she doesn't go around and hand pass medication. It's Chavez's problem. Yeah. Valdo's. So that's a predicate for Chavez's liability, for Garcia's, Lopez's, Galleo's, and Valdo. It's a predicate for their liability because they failed to, according to the complaint, failed to make sure that he got this withdrawal kit, right? I don't agree, Your Honor. What's wrong with that? I think what is not in the complaint is there's no allegation that any of those particular officers have a duty to ensure that he takes medications. So nobody. So you can say, I'm going to order it, and then there's, I think, seven people that end up being on duty. So nobody follows through on it. Nobody gets the kit. And so on a 12 v. 6, you can dismiss it and deny leave to a man because, well, nobody specifically had a duty to make sure that the thing that was ordered actually got to the guy that's throwing up blood for three consecutive days. I think the issue is whether or not these particular individual defendants had an obligation as a guard, which they don't, to pass that medication. Medications are passed out by a nurse in the facility that goes from cell to cell. That's jumping ahead, isn't it? I mean, we don't have that in the complaint, do we? There is an allegation in the complaint of several things related to that. One is a nurse states in the complaint that they will pass out medications and that detainees in these situations can decline to take them if they choose not to take them. So to come back to Your Honor's question, it's not a matter of forcing medications on these inmates. They can choose to take the medication or not if their symptoms are such that they want to take them. There's another allegation in the complaint that at least on January the 6th, these medications were offered three times and he declined them. The other allegation is that a nurse- Where in the First Amendment complaint is that? That's, I don't know the- I think it's paragraph 166, I think. I'll have to- All right. But I believe that's in the complaint that he declined medications really the day before his demise. And so the evidence is mixed about that. But Chavis understood that he declined medications that day, although there's also an allegation in the complaint that the nurse believed that he took them that day, which would bear on her subjective state of mind. And I don't know of any evidence or allegation that suggests either Chavis or the nurse would have been misrepresenting anything for any particular reason. Well, they specifically allege in the First Amendment complaint that all of the defendants or a variety of the defendants have given completely contradictory explanations about whether or not Ortiz ever got the withdrawal kit. So, I mean, I think it may be going a little too far to say that they've never impugned the veracity of the defendants saying that he got the withdrawal kit. I mean, they did it with an explanation. Well, if the complaint in this lawsuit is that he didn't receive withdrawal medications from the nurse passing them out, that she just declined to perform that duty, well, who is that? Because we don't have the right defendant here. I mean, we were talking about officers who are not alleged to have that responsibility. There are no plausible factual allegations of any officer in this case of having the duty to go around passing out medications. The only medical professional here that we've talked about, well, there's two. There's the doctor who makes the prescription and the intake nurse who initially made the referral. There's also no allegation of authority by her to go around and hand out medications to any of the detainees. Why isn't this a case where, at least at some point, the seriousness of his medical condition made it obvious that he needed to be referred to a doctor or to the medical unit? Just, you know, your basic you-know-when-you-see-it case. Right. And so we've got different defendants at different times. The nurse talks to him, but he's not really exhibiting any specific symptoms that are described in the complaint. He's coherent, able to articulate things. There's nothing that appears obvious other than he's expressed his way he's going to withdraw. I guess I'm setting her aside because she didn't witness the vomiting. What about the five officers? At some point, when is it? When does it become obvious? Well, I think there has to be. We're running a prison facility here, and at some point. I think we have to look at the bigger pictures and the totality of the evidence that each officer observed or heard about at the time they encountered this inmate. The first one is Officer Chavez. There's a report by the inmate to Officer Chavez that he had vomited blood. That's significant. I agree. But there's countervailing factors which don't make it obvious. The detainee is not requesting any medical help, doesn't ask to go see a physician. There's a complaint that Mr. Ortiz affirmatively did not request treatment, did not request medication. That's an argument you've made, but that's not in the complaint. Well, Mr. Ortiz, there's no allegation in the complaint that Mr. Ortiz requested medical treatment beyond the initial discussion with the nurse at any time during the entire incarceration. The other thing is that Officer Chavez would have also been aware that he had declined medication, which I think would lead an ordinary person to believe that perhaps his symptoms weren't severe enough to warrant taking the medication at that time. The other thing is that we know, at least from Officer Chavez's perspective, he took note of the event that was reported to him by the detainee and passed it on to the next shift. I don't think that's consistent with a deliberately indifferent mindset, which is what needs to be proven. Well, it certainly is inconsistent with Lopez, Garcia, and Gallego saying that they had no idea that the guy was having problems if Chavez had affirmatively reported to the next crew that this guy, of his condition, and Chavez had already not only been told, but he had seen him vomiting blood. Well, I don't know that there's an allegation anywhere that Chavez saw him vomiting blood. I've looked at the complaint, the second amendment complaint, several times. It's not in there. In the later individuals, Valdo didn't see anything. Dylan Chavez saw him dry heaving and saw some vomit on the floor, which I would suggest is consistent with someone withdrawing from heroin and not necessarily an emergent medical condition, especially when the individual is not asking for medical attention. And the remaining officers did not see any significant symptoms up until the time when the hemorrhage occurred. And so in terms of the obvious, getting back to your original question, Your Honor, the symptoms presented to Officer Chavez were a mixed bag at best and not obvious, and the symptoms really related to all of the remaining individual defendants were consistent with a heroin withdrawal. It was withdrawal. It was what was anticipated. It was what the medication was for, but it wasn't an obvious indicia of an untreated medical condition. And so in that sense, it is not obvious to them. And this was consistent with what had happened to him in the facility before. He had not been medically withdrawn before and had done okay. And I think the officers can realize that someone withdrawing from heroin is not automatically admitted to the emergency room  Why was it futile to allow a Second Amendment complaint? Well, I think, first of all, in terms of what's in that complaint, we discussed what the factual allegations would have been. I mean, I've kind of accepted those as true, taking that on in the motion and in the appeal. The main futility argument had to do with the Monal claim that we haven't discussed this morning and whether that adequately stated a claim against Santa Fe County. It does not because of the lack of prior factual allegations of specific constitutional violations. But as to the individuals that we've talked about, what the Second Amendment complaint added was they knew or should have known, which is negligence. And so that's futile because all we're talking about is a negligence standard based on what we think they knew or should have known, as opposed to what they actually knew and perceived at the time. Counsel, I think your time's expired. I think it is. Thank you. Your time expired also, I understand. Is that correct, Kevin? Was she over or under? She was over. Counselor, excused. Thank you. Appreciate your arguments and the case shall be submitted.